# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00019-CV

**Sterling Wayne Wyatt, Appellant**

**v.**

**Capital One Auto Financing, Appellee**

### FROM COUNTY COURT AT LAW NO. 4 OF WILLIAMSON COUNTY
### NO. 05-1004-CC1-4, HONORABLE JOHN MCMASTER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Sterling Wayne Wyatt appeals from a grant of summary judgment and award of attorney's fees to appellee, Capital One Auto Financing ("COAF"). Wyatt purchased a car from Waco Auto Imports ("WAI"), which then assigned Wyatt's purchase contract to COAF. Wyatt refused to recognize the validity of the assignment and consequently refused to tender his monthly car payments to COAF. COAF eventually reacquired Wyatt's car, sold it for less than Wyatt owed on it, and filed this lawsuit to recoup the shortfall. Wyatt counterclaimed for damages he claims to have incurred as a result of COAF's allegedly wrongful reacquisition and sale of his car. On appeal, Wyatt argues that COAF's summary-judgment evidence did not conclusively establish either that COAF was entitled to recover its shortfall from the sale of Wyatt's car or that Wyatt's counterclaims were meritless. We will affirm the summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 13, 2001, Wyatt purchased a Kia Sedona minivan from WAI. Wyatt executed a standard-form contract (the "Texas Simple Interest Vehicle Retail Installment Contract") that was stamped, presumably by WAI, with the identification number "51298." The contract contained the following provisions (among others):

- "Any change in this contract must be in writing and signed by you [the purchaser] and the Creditor."

- "You [the purchaser] give the Creditor a security interest in . . . [t]he vehicle."

- "You [the purchaser] agree to have the certificate of title show [the Creditor's] security interest (lien) in the vehicle."

- "If no other Assignee is named in a separate assignment attached to this contract, the Seller assigns it to Mazda American Credit."

Wyatt alleges that no separate assignment was attached to the contract when he signed it and that consequently he took possession of the car thinking that WAI would assign the contract to Mazda American Credit. In fact, WAI assigned the contract to COAF.

It is not clear exactly when, but at some point WAI executed a pre-printed "Contract Assignment" form on COAF letterhead that stated: "Seller hereby expressly sells, assigns and transfers all right, title and interest to Capital One Auto Finance." The form was signed by WAI employee Mary Ann Casey. Her signature was dated October 13, 2001, the same day Wyatt executed his purchase contract with WAI. The form also contained the following sentence: "This assignment is attached to and expressly made a part of Contract Number _____." The blank following "Contract Number" was not filled in, but the information contained in other blanks on the

2

form was sufficient to identify "Mary Ann Casey of Waco Auto Imports" as "Seller," "Sterling W. Wyatt" as "Buyer," and "10-13-01" as the execution date of the contract being assigned.

It is also not clear exactly when Wyatt first received a copy of this Contract Assignment form or other notification that his contract had been assigned to COAF. The record indicates, however, that at the latest, COAF informed Wyatt of the assignment by letter dated October 25, 2001.[1] The record also indicates the following:

- The title to Wyatt's new car, issued on November 3, 2001, named COAF as sole lienholder and October 13, 2001 as the date that COAF's lien attached;

- Wyatt received a payment coupon book from COAF on or around November 15, 2001;

- COAF began sending monthly account-balance statements to Wyatt in November 2001;

- COAF sent a letter to Wyatt on November 27, 2001 that stated: "CapitalOne [sic] Auto Finance received a letter from you [presumably referring to Wyatt's November 8, 2001 letter] regarding validation of [your] account. Enclosed you will find copies of all documents pertaining to your account with CapitalOne [sic] Auto Finance." The letter indicates that twelve pages of enclosures were included, but only one of those pages is in the record—a copy of the above-described Contract Assignment form executed by WAI.

---

[1] That letter is not in the record, but Wyatt's reply letter is. Titled "Re inquiry dated 10/25/01," and dated November 8, 2001, Wyatt's letter states:

I am confused by your inquiry. This is my notice that your claim is disputed . . . . I request validation be made pursuant to the Fair Debt Collection Practices Act. Please complete and return the attached **disclosure request form** . . . . I am requesting a 'validation,' containing competent evidence that I have some contractual obligation to make payments to you.

In another letter to COAF, dated January 14, 2002, Wyatt refers to "Your allegation of Debt, 10-25-2001." These letters indicate that COAF's letter of October 25, 2001 informed Wyatt that COAF held his debt.

Despite these facts, Wyatt insisted on further proof that COAF had been assigned his contract. On December 12, 2001, he sent COAF a "request for clarification" letter that apparently elicited no response.[2] On January 14, 2002, he sent COAF another letter that stated:

> Upon receipt of your allegation of debt [presumably the October 25, 2001 letter discussed above], I requested validation via a Disclosure Statement be made pursuant to the Fair Debt Collection Practices Act. Your provided package of data [presumably referring to the enclosures accompanying COAF's November 27, 2001 letter] did not contain a contract with Capital One signed by me, nor did it contain my signed contract with another party allowing an un-agreed change or assignment of any debt to Capital One or any other party. My request for clarification has gone unanswered in excess of 30 days and you are in a condition of FAULT.
>
> This is your final opportunity to clear your FAULT by providing me, withing [sic] five (5) days from your receipt of this notice under the Administrative Procedures Act, a contractual or legal basis for your allegation of being a bonafide collector of a debt from me.
>
> Your failure to timely satisfy my requests within the requirements of the Fair Debt Collection Practices Act and Administrative Procedures Act places you in DEFAULT of any alleged claim against me, and is construed as (a) your absolute waiver of any and all claims against me, and (b) that your collection efforts are being terminated, and (c) as your tacit agreement to compensate me for defense costs and attorney fees hereafter.
>
> Absent clearance of your condition of FAULT, then pursuant to the Fair Debt Collection Practice Act, I request that you cease further communications with me except to complete and return the attached COLLECTOR'S NOTICE as required by law.

Wyatt apparently received no response to this letter either, and on February 11, 2002, he sent another letter to COAF. Titled "NOTICE OF DEFAULT AND DEFAULT," that letter stated:

---

[2] Wyatt's "request for clarification" letter is not in the record, but Wyatt refers to it in his January 14, 2002 letter to COAF, which is in the record.

This is NOTICE that CAPITAL ONE AUTO FINANCING is in DEFAULT of timely satisfying my requests within the requirements of the Fair Debt Collection Practices Act and Administrative Procedures Act. Your specific DEFAULT is for failing to provide evidence of a contractual or legal basis for allegations by CAPITAL ONE AUTO FINANCING of their being a bonafide collector of a debt from the undersigned . . .

The TEXAS SIMPLE INTEREST VEHICLE RETAIL INSTALLMENT CONTRACT which you provided clearly addresses STERLING W WYATT as the BUYER, and designates "WACO AUTO IMPORTS" as the CREDITOR and carries a final statement cautioning that *"Any changes in this contract must be in writing and signed by you [the buyer] and the Creditor."* You have failed to provide any addendum to the contract signed by me and naming CAPITAL ONE AUTO FINANCING as an agreed assignee. The contract assignment you provided is signed only by WACO AUTO IMPORTS and alleges to be a part of the above contract but *does not carry my signature* as required by the basic contract provisions, and thus is not binding upon me as a matter of contract law and the Texas Business and Commerce Code. WACO AUTO IMPORTS is without contract or legal authority to sell my debt to CAPITAL ONE AUTO FINANCING, and therefor [sic] CAPITAL ONE AUTO FINANCING is absent standing to enforce their alleged debt upon me.

. . . .

Your DEFAULT . . . is construed
(a) as your absolute waiver of any and all claims against me, including withdrawal of any lien arising out of my contract with WACO AUTO IMPORTS erroneously filed in the name of CAPITAL ONE AUTO FINANCING on any of my property,
(b) that your collection efforts are being terminated, and that any CAPITAL ONE AUTO FINANCING Statements of Account subsequently received are sent in error and may be ignored, and
(c) as your tacit agreement to compensate me hereafter for necessary defense costs and attorney fees, plus one million dollars punitive damages for proceeding without first providing substantive proof on the administrative record.

Wyatt recorded this letter in the public records of McLennan County. In the meantime, he had tendered his first three monthly car payments to WAI. WAI apparently kept the

first two payments (it is not clear what it ultimately did with them), but it returned the third.  In the

letter to Wyatt accompanying the returned third payment, sent on or about February 1, 2002,

WAI stated:

> As you know we are not your creditor—you got your financing through Capital One
> Auto Finance.  Your loan and contract is with them and not with us.  We are sending
> your check back to you again BECAUSE we are not your lender.  We aren't trying
> to collect any money from you and we are asking you to stop sending us your
> payments.  Your contract is with Capital One Auto Finance and your payment should
> be made to them.

Wyatt nevertheless insisted on sending his fourth monthly car payment to WAI as

well.  In a letter transmitting that payment, dated March 7, 2002, Wyatt stated:

> I am in receipt of your letter sent o/a 2/1/2002 indicating your disposition of
> Contract #51298 to Capital One Auto Finance and returning my second (payment #3)
> check.  Never-the-less [sic], I am enclosing payment #4 against that Contract made
> out to you since Capital One has failed to provide me with proof they are the lawful
> Holder in due course.  If you have some documentation that shows Capital One is the
> lawful Holder, would you please provide me with a copy?  Alternatively, please
> indicate to whom, and by which instrument, you surrendered being Holder of the
> contract . . . .
> In the absence of you providing me with an instrument containing my
> signature amending the above referenced contract or assigning the contract to a third
> party, I will assume such does not exist in your administrative records.

WAI returned Wyatt's fourth payment as well.  In the accompanying letter, dated

March 25, 2002, WAI wrote:

> We have received your letter dated 3/7/02.  This letter is meant to help you
> understand that Waco Auto Imports *is not* and *will not* be servicing your retail auto
> loan on your 2002 Kia Sedona . . . .

6

This retail loan has been sold to and assigned to Capital One Auto Finance. A copy of the assignment is enclosed for your information.

Please understand that your auto financing is in order and your payments are payable to Capital One Auto Finance. Your monthly payments are $478.79 and due on the 12th of each month. Your payments should be made to Capital One Auto Finance, 3901 Dallas Pkwy, Plano, Tx 75093. I am returning your check for $478.79. Please forward this to Capital One at the above address.

The "copy of the assignment" that WAI enclosed with its March 25, 2002 letter differed from the Contract Assignment form that COAF had previously sent Wyatt. Both assignments were filled out on the same "Contract Assignment" form bearing COAF letterhead, so both contained the pre-printed sentence "This assignment is attached to and expressly made a part of Contract Number _____." Unlike the form COAF had sent Wyatt, however, the form WAI sent Wyatt had the blank in this sentence filled in with "#669322."[3] In addition, the form WAI sent Wyatt (1) was signed by someone other than Mary Ann Casey, and (2) identified "Waco Kia of Waco, TX" rather than "Mary Ann Casey of Waco Auto Imports" as "Seller." In other words, COAF and WAI sent Wyatt differently filled-out Contract Assignment forms. Both forms, however, purported to have been signed on October 13, 2001 and to effect the assignment of Wyatt's contract to COAF.

Wyatt did not forward his March 2002 car payment to COAF as WAI instructed him to, nor did he tender any subsequent payments to anyone.[4] On June 20, 2002, COAF sued Wyatt in

---

[3] COAF's November 27, 2001 letter to Wyatt indicates that "6693220" was the "account number" COAF assigned to Wyatt's contract. Recall, in contrast, that WAI had assigned an identification number of "51298" to Wyatt's contract before it assigned it to COAF.

[4] In his Verified Original Answer and Counter-Claim filed in this suit, Wyatt stated that WAI's and COAF's failures to validate the assignment to his satisfaction "were valid reasons to make no further payments to anyone until the matter was satisfactorily explained or otherwise

7

McLennan County to regain possession of the Kia. The court issued a writ of sequestration that, for reasons not revealed in the record, was returned unserved. COAF then filed a motion for contempt against Wyatt, apparently for refusing to comply with the writ of sequestration even though it was never served on him. Wyatt filed an Answer, a motion to quash the writ of sequestration, a motion to deny COAF's motion for contempt, a counterclaim, and a demand for a jury trial.[5] The McLennan County district court held a hearing on September 13, 2002. Its docket entry for the hearing states: "COURT FOUND SUFFICIENT EVIDENCE OF CONTEMPT BUT WITHHELD FINDING BECAUSE DEFENDANT SURRENDERED KEY TO VEHICLE IN QUESTION."[6] Wyatt claims that he surrendered the key only because the court threatened to incarcerate him immediately if he did not.

On September 16, 2002, COAF notified Wyatt that it intended to sell his Kia unless Wyatt paid it the balance due on his contract ($25,137.22) within ten days. Wyatt did not do so, and on October 28, 2002, COAF notified Wyatt that it had sold the Kia for $14,200 and that Wyatt still

---

decided in a judicial forum."

[5] These documents are not in the record, but their existence is reflected in the McLennan County court's docket sheet (which is in the record).

[6] This finding is troublesome given that (1) the writ of sequestration apparently was never actually served on Wyatt, and (2) the record suggests no grounds for contempt other than refusal to obey the writ. It is also troublesome that, despite the docket entry stating that the contempt finding was withheld, the court in fact partially granted COAF's motion for contempt. In an order dated September 13, 2002, the court held Wyatt in contempt "for refusing to surrender the motor vehicle to the Constable as ordered." The order also stated, however, that "Defendant shall not be fined nor jailed because he has now surrendered the vehicle to Plaintiff." Declining to fine or jail Wyatt after holding him in contempt is not the same thing as "withholding" a contempt finding.

owed it $11,167.22—the difference between the sale price and the amount COAF was due under the contract.[7]

Neither party pursued further substantive activity in the McLennan County case, and the court finally dismissed it for want of prosecution on October 6, 2004.[8]

On August 22, 2005, COAF filed this lawsuit against Wyatt to collect the money it lost on the sale of Wyatt's Kia.[9] COAF alleged in its new suit that Wyatt owed it $18,633.33, representing its $11,167.22 loss on the sale of Wyatt's car plus interest. On September 26, 2005, Wyatt filed a Verified Original Answer and Counter-Claim in which he (1) argued that COAF had no right to recover that amount, and (2) counterclaimed for damages caused by COAF's allegedly wrongful taking and sale of his car.

On September 6, 2006, Wyatt moved for summary judgment. COAF moved to refer the case for alternative dispute resolution, but Wyatt refused to participate. The court denied Wyatt's motion for summary judgment on March 26, 2007, and COAF subsequently filed its own motion for summary judgment. COAF's summary-judgment evidence included the following:

---

[7] Wyatt claims on appeal that COAF sold his car without his knowledge. This claim contradicts Wyatt's admission, made in a sworn affidavit filed with the trial court, that he received COAF's September 16 and October 28, 2002 letters and chose not to act on them.

[8] Presumably COAF allowed the case to languish because it had gotten what it wanted—namely, possession of Wyatt's car. Wyatt's Verified Original Answer and Counter-Claim in this suit suggests that Wyatt, who has appeared pro se in all related proceedings, believed he could not pursue his counterclaims without additional activity by COAF.

[9] COAF filed this suit in Williamson County because Wyatt had moved there some time between 2003 and 2005.

- an affidavit by COAF's custodian of records, Stephen Ortiz, attesting that COAF owned and held Wyatt's purchase contract and was owed $18,633.33 on it;

- a copy of Wyatt's purchase contract;[10]

- a copy of the Contract Assignment form signed by Mary Ann Casey; and

- a copy of the title to Wyatt's car, listing COAF as sole lienholder.

The court granted COAF's summary-judgment motion and awarded COAF its costs and attorney's fees. Wyatt then perfected this appeal.

**STANDARD OF REVIEW**

Summary judgment is proper when the movant establishes that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991). In reviewing a grant of summary judgment, we take as true evidence favorable to the nonmovant, indulging every reasonable inference and resolving all doubts in the nonmovant's favor. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

---

[10] Wyatt asserts that this copy of the contract was not admissible as evidence because it was "an oversize copy which cuts off the top of the page, thus failing to be an exact 'duplicate'" of the original as required by Texas Rule of Evidence 1003. We disagree. Texas Rule of Evidence 1001(d) defines "duplicate" as "a counterpart produced by [means] . . . which accurately reproduce the original." Even though COAF's copy of the contract was partially cut off, most of the contract, including unique identifying features such as Wyatt's signature and the Vehicle Identification Number of his car, are readily discernible. In other words, COAF's copy accurately reproduces enough of the original contract that one cannot reasonably doubt it is a true copy of the original.

**DISCUSSION**

Wyatt contends that summary judgment was improper because fact questions exist as to (1) whether COAF was actually assigned Wyatt's contract; (2) whether Wyatt was entitled to relief on his counterclaims; and (3) whether Wyatt breached his purchase contract, thus entitling COAF to seize and sell his car and sue him for its loss on the sale.

Wyatt cites three facts to support his argument that COAF was never validly assigned his contract: (1) his purchase contract stated that "[a]ny change in this contract must be in writing and signed by you [the purchaser] and the Creditor"; (2) his purchase contract stated that "[i]f no other Assignee is named in a separate assignment attached to this contract, the Seller assigns it to Mazda American Credit"; and (3) COAF failed to verify its assignment to Wyatt's satisfaction.

Wyatt misconstrues the elements of a valid contract assignment. Texas Business and Commerce Code section 9.406 states: "[A] term in an agreement between an account debtor and an assignor . . . is ineffective to the extent that it . . . requires the consent of the account debtor . . . to [an] assignment." Tex. Bus. & Com. Code Ann. § 9.406(d)(1) (West 2002 & Supp. 2009). In other words, Wyatt's purchase contract could not legally require Wyatt's consent to an assignment.[11]

---

[11] This fact does not make a superfluity out of the contract provision requiring Wyatt's consent to "any change in this contract"; that provision still applies to terms of the contract itself, such as purchase price, interest rate, and payment dates. Nor does this fact make a superfluity out of the contract provision stating that "[i]f no other Assignee is named in a separate assignment attached to this contract, the Seller assigns it to Mazda American Credit." This provision does not require a separate assignment to be attached to the contract *at the time of sale*. WAI did in fact attach its Contract Assignment form to the contract when it later transmitted both documents to Wyatt.

Texas Business and Commerce Code section 9.406 also states:

> [A]n account debtor . . . may discharge its obligation by paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee. After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor.

*Id*. § 9.406(a). A related subsection of the statute states that "if requested by the account debtor, an assignee shall seasonably furnish reasonable proof that the assignment has been made. Unless the assignee complies, the account debtor may discharge its obligation by paying the assignor, even if the account debtor has received a notification under Subsection (a)." *Id*. § 9.406(c). In other words, once Wyatt received "notification" that WAI assigned his contract to COAF—and once COAF provided "reasonable proof" of the assignment—Wyatt could discharge his debt only by paying COAF directly.

The question in the present case, then, is whether the record contains conclusive evidence that COAF provided Wyatt "reasonable proof" of the assignment. COAF attempted to enclose proof of its assignment with its November 27, 2001 letter to Wyatt. Only one of the twelve pages it enclosed is in the record—namely, the Contract Assignment form signed by WAI employee Mary Ann Casey. Wyatt argues that the form was not "reasonable proof" of the assignment because it was not completely filled out[12] and because it differed from the Contract Assignment form he later received from WAI. We disagree. First, the form was printed on COAF

---

[12] Recall that the sentence "This assignment is attached to and expressly made a part of Contract Number _____" was left blank.

letterhead. *See id*. § 9.406, cmt. 2. (assignment "normally could be ['authenticated'] by sending notification on the notifying person's letterhead"). Second, even though the form contained a blank, it still clearly identified Wyatt's purchase contract as the contract being assigned; it named "Mary Ann Casey of Waco Auto Imports" as "Seller," "Sterling W. Wyatt" as "Buyer," and "10-13-01" as the execution date of the contract being assigned. Third, even though the form COAF sent Wyatt was filled out in a slightly different manner from the form WAI sent Wyatt, both forms clearly concerned Wyatt's October 13, 2001 purchase contract with WAI. Thus, we hold that the summary-judgment evidence conclusively demonstrates that COAF supplied Wyatt with "reasonable proof" of its assignment even though the record does not contain the other paperwork COAF transmitted to Wyatt with its November 27, 2001 letter.[13] *See id*. § 9.406(b)(1) (notification of assignment is effective if it "reasonably identif[ies] the rights assigned").

This conclusion is buttressed by the fact that Wyatt had many other forms of proof that COAF was assigned his contract. First, the title to Wyatt's car listed COAF as sole lienholder.[14] Second, COAF sent Wyatt a payment coupon book and started sending him monthly account balance statements in November 2001. Third, as discussed above, WAI repeatedly returned checks to Wyatt

---

[13] We note, however, that even though the other paperwork is not in the record, Wyatt states in his reply brief that it included a copy of the first page of his purchase contract and a copy of his car's certificate of title.

[14] Wyatt admits that he possessed a copy of the certificate of title when he received COAF's November 27, 2001 letter. He nevertheless argues that the certificate of title was not proof of a valid assignment because "[s]uch a certificate is not issued as legal proof of lienholder status . . . . [It] only stands as hearsay evidence as to any possible rights of the therein named lienholder(s)." That is not the law. *See Murrah v. Lopez*, 279 S.W.2d 159, 160 (Tex. Civ. App.—Austin 1955, no writ) (automobile titles are public records not subject to hearsay rule). In fact, notation on the certificate of title is the *only* way for a lienholder to secure an automobile lien. *See* Tex. Transp. Code Ann. § 501.111(a) (West 2007).

and explained to him that it had assigned his contract to COAF. In light of these facts, Wyatt could not reasonably continue to doubt that COAF had been assigned his contract. In any event, Wyatt was not entitled to withhold payments altogether; rather, he was obligated to keep paying WAI until reasonable proof of assignment was furnished. *See id*. § 9.406, cmt. 4 (stating that § 9.406(c), which allows account debtor to seek reasonable proof of assignment, "does not excuse the account debtor from timely compliance with its obligations" while awaiting proof). Thus, Wyatt breached his purchase contract by discontinuing payments. As the assignee-in-fact of Wyatt's contract, COAF was entitled to seize Wyatt's car, sell it, and sue Wyatt for its loss on the sale regardless of whether Wyatt questioned the validity of its assignment. *See Burns v. Bishop*, 48 S.W.3d 459, 466 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (assignee entitled to enforce all rights that assignor possessed).

Wyatt cites the federal Fair Debt Collection Practices Act, 15 U.S.C.A. §§ 1692 *et seq*. (West 2009), to support his assertion that he was entitled to withhold payments because COAF did not verify its assignment via certain statutorily mandated procedures. The Fair Debt Collection Practices Act does not apply here, however, because COAF does not qualify as a "debt collector" under the Act. *See Neff v. Capital Acquisitions & Mgmt. Co.*, 352 F.3d 1118, 1121 (7th Cir. 2003) (Fair Debt Collection Practices Act applies only to "debt collectors" as defined by Act); 15 U.S.C.A. § 1692a(6) (defining "debt collector" for purposes of Act).

In sum, the record conclusively establishes that COAF was assigned Wyatt's purchase contract and that Wyatt had ample verification of that fact. COAF was entitled to receive payment on the contract and to seize and sell Wyatt's car when Wyatt failed to make those payments. It

necessarily follows that Wyatt did not sustain legally cognizable damage from COAF's actions. *See Martin v. Trevino*, 578 S.W.2d 763, 769 (Tex. Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.) (use of process for proper purpose not actionable). Thus, Wyatt's counterclaims failed as a matter of law, and COAF was entitled to summary judgment on them.

Finally, COAF submitted affidavits establishing that Wyatt owed it $18,633.33 for its losses on the sale of Wyatt's car. Wyatt did not controvert that amount, so COAF was entitled to recover it on summary judgment. *See* Tex. R. Civ. P. 185. COAF was also entitled to recover its attorney's fees because it sued on a written contract. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West 2008).

## CONCLUSION

The record conclusively establishes that COAF was assigned Wyatt's purchase contract. Thus, COAF was entitled to be paid by Wyatt and to seize and sell Wyatt's car when Wyatt refused to pay. It was also entitled to recover its loss on the sale of Wyatt's car. As a result of these facts, which COAF established through competent summary-judgment evidence, Wyatt's counterclaims failed as a matter of law. We affirm the trial court's summary judgment.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed:   January 29, 2010

15